**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **WHITE FAMILY HARMONY INVESTMENT, LTD.,** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| **vs.** | |
| **TRANSWESTERN WEST VALLEY, LLC, ET Al.,** | Case No. 2:05CV495DAK |
| **Defendants.** | |

This matter is before the court on Plaintiff's Motion for Partial Summary Judgment, Defendants Business Properties LLC and Transwestern Metro Business Park LLC's Motion for Summary Judgment on Plaintiff's Alter Ego Cause of Action, and Plaintiff's Cross-Motion for Summary Judgment on Alter Ego Claim. The court held a hearing on the motions on September 5, 2007. At the hearing, Plaintiff was represented by Craig Adamson, Craig Hogan, and Joelle Kesler, and Defendants Business Properties, LLC, Transwestern West Valley LLC, and Transwestern Metro Business Park were represented by James K. Tracy, Steven A. Miller, and Jennifer Brown. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties. The court has further considered the arguments made by counsel at the hearing and the law and facts relevant to the motions. Now being fully advised, the court enters the following Memorandum Decision and Order.

1

**BACKGROUND**

On February 1, 1982, Joseph R. and Vera M. White entered a Lease Agreement with Alliance Enterprises, Inc. and F.C. Stangl III with respect to three buildings within a larger business park, known as the Metro Business Park.  The Metro Business Park has twelve other buildings.  Pursuant to the terms of the Lease Agreement, the lessees leased the property from the Whites for a thirty-year term, with two five-year options.

Six years later, in 1988, Alliance Enterprises and Stangl assigned their interest in the Lease Agreement to Textron through a document entitled "Assignment of Ground Lease."  In addition to the leasehold interest it obtained by assignment, Textron owned the remaining twelve buildings in the Metro Business Park in fee.   Approximately nine years later, on September 22, 1997, defendant Business Properties entered an agreement to purchase Textron's interest in the business park.  This "Agreement of Purchase and Sale" included both the fee property and the leasehold.

Prior to closing on the purchase of the business park, Business Properties formed, through its investment managing entity, Transwestern Investments, two entities referred to as Transwestern West Valley and Transwestern Metro Business Park.  Transwestern West Valley took the assignment of the Lease Agreement and was created to act as lessee of the leasehold.  Transwestern Metro Business Park was formed to hold the title to the fee property.

On December 8, 1997, Textron assigned its interest in the Lease Agreement to Transwestern West Valley through a document entitled "Assignment and Assumption of Ground Lease."  Pursuant to the Lease Agreement, Transwestern West Valley assumed the obligation to pay the Whites $16,875 per month.

2

From December 1997 through June 2004, the Transwestern entities operated the Metro Business Park, subleased portions of the property to subtenants, and collected deposits, rents, taxes and common area maintenance fees from their subtenants on a monthly basis.  During this same time frame, Transwestern West Walley paid the Lease Payment and other fees due to the Whites.

On November 18, 2003, Joseph and Vera White transferred title to the three buildings to a limited partnership, known as White Family Harmony Investment, Ltd. ("WFHI"), which had been organized in May 2002.  The Whites did not provide notice to Transwestern West Valley that they had transferred their interest in the property to WFHI.

In May 2004, Transwestern Metro sold its fee interest in the rest of the Metro Business Park.  In June 2004, Transwestern West Valley made its last monthly Lease Payment even though the lease term did not expire until 2012.  From July 2004 to October 2004, Transwestern West Valley continued to collect monthly rents from its subtenants in the three buildings, but did not make any Lease Payments to WFHI.

On October 19, 2004, Transwestern West Valley surrendered possession of the leasehold property.   Transwestern West Valley notified the Whites, through their legal counsel, that Transwestern West Valley considered the White's transfer of the title to the property to WFHI to be a breach of the Lease Agreement.  Transwestern West Valley also notified the Whites that it did not agree to lease the property from WFHI.

At various times during the time that Transwestern West Valley leased the property from the Whites, it made payments to "Joseph R. & Vera White," "Joseph R. White & Vera O. White dba Harmony Investments Ltd.," and "Harmony Investment Ltd."  No payments were specifically

3

made to the Plaintiff White Family Harmony Investment, Ltd.

Since October 19, 2004, White Family Harmony Investments has managed the property and collected rents directly from subtenants. It has also leased a portion of the vacant space. The rents collected on a monthly basis, however, have not consistently covered the monthly lease payment obligation of $16,875. The thirty-year lease does not expire until 2012.

## DISCUSSION

Plaintiffs have two primary claims in this case: (1) a breach of contract claim based on the Lease Agreement; and (2) an alter ego claim relating to the various Transwestern entities created by Business Properties LLC.

Plaintiff's first motion for partial summary judgment is based on the breach of contract claim against Transwestern West Valley. Defendants' motion for partial summary judgment seeks judgment on Plaintiffs' alter ego claim on the grounds that Plaintiffs cannot establish the second element of an alter ego claim. Specifically, Defendants argue that even if Plaintiff can establish that there was a disregard of the corporate form between the Transwestern companies and Business Properties, it cannot demonstrate that such disregard would sanction a fraud, promote injustice, or cause an inequitable result. Plaintiff's cross-motion seeks summary judgment in its favor on both elements of the alter ego claim. Alternatively, in response to Defendants' motion on the second element of the alter ego claim, Plaintiffs contend that there is at least a question of fact precluding judgment in favor of Defendants on that claim.

### Plaintiff's Motion for Partial Summary Judgment

Plaintiff argues that it satisfies the elements of its breach of contract claim as a matter of law. The elements of a breach of contract claim include: (1) the existence of a contract; (2)

performance by the party claiming breach; (3) nonperformance of the contract by the other party to the contract; and (4) damages. *Mackey v. Cannon*, 996 P.2d 1081, 1085 (Utah Ct. App. 2000). It is undisputed that Transwestern West Valley occupied the property pursuant to the Lease Agreement. Transwestern West Valley had payment obligations under the Lease Agreement until 2012. It failed to satisfy those obligations as of July 2004. WFHI has suffered damages and continues to suffer damages.

Transwestern West Valley, however, argues that it has not entered into any lease of the property or any other contractual arrangement relating to the property with WFHI. Rather, it contends that it leased the property from Joseph and Vera White only in their individual capacities. Transwestern West Valley's position focuses on the fact that WFHI did not ask it to execute an attornment. Transwestern West Valley contends that it is clear from the face of the Lease Agreement that WFHI is a stranger to the lease, and whether an attornment occurred is a disputed issue that precludes summary judgment on the issue of liability.

Attornment, as recognized by Utah courts, "is the act of a person who holds a leasehold interest, or estate for life or years, by which he agrees to become the tenant of a stranger who has acquired the fee in the land, or the remainder or reversion, or the right to the rent or services by which the tenant holds. It is an act by which a tenant acknowledges his obligation to a new landlord." *Consolidated Realty Group v. Sizzling Platter, Inc.*, 930 P.2d 268, 270 n.2 (Utah Ct. App. 1996). Unless there is an attornment, the new property owner "cannot distrain or bring an action for rent, as there is no relation of landlord and tenant between them." *Evershed v. Berry*, 436 P.2d 438, 439 (Utah 1968). To create the relationship of landlord and tenant, "there must be

an attornment of the tenant or some action on his part which will operate as an attornment." *Id.* at 440.

WFHI does not dispute the definition of attornment cited by Transwestern West Valley, it argues only that Transwestern West Valley overstates the doctrine's applicability.  A tenant's need to attorn to the landlord's successor is "a relic of the old feudal days in England."  *See* Joshua Stein, *Needless Disturbance?*, 37 Real Prop. Prob. & Tr. J. 701, 708 n.12 (2003).  Attornment was abolished by English statute in 1705.  Under long-standing common law, "a conveyance of the reversion brings the grantee in privity with the lessee, puts him in the place of the original lessor."  *Glidden v. Second Avenue Inv. Co.*, 125 Minn. 471, 473-74 (1914).

Transwestern West Valley's attornment argument ignores fundamental principles of property law.  "In general, when title passes, the lessee ceases to hold under the grantor, and he or she becomes a tenant of the grantee under the same terms as he or she held of the grantor.  The new relationship is consummated by a conveyance of the reversion.  Attornment or consent by the tenant is no longer necessary."  49 Am. Jur. 2d *Landlord and Tenant* § 898 (2007).  Put another way, "[t]he relationship of landlord and tenant may arise from attornment, that is, the consent of the tenant to hold under a transferee of the reversion; however, the grantee of the reversion may acquire all the rights and remedies of the lessor without an attornment by the lessee.  As a general rule, 'when the landlord conveys the property, his or her lessee or tenant then becomes the lessee or tenant of the vendee.'"  52 C.J.S. *Landlord & Tenant* § 20 (2007).

"[A] deed, unlike a foreclosure, is not legally capable of terminating a subordinate estate; therefore, any grantee under a deed continues to have privity of estate with the tenant."  Joshua Stein, *Needless Disturbances?*, 37 Real Prop. Prob. & Tr. J. 701, 732-33 (2003).  Under Utah

law, attornment is necessary only when the tenancy is terminated by operation of law, such as when a mortgagee with paramount title forecloses on the leased property.  In *Consolidated Realty Group v. Sizzling Platter, Inc.*, 930 P.2d 268, 271-72 (Utah Ct. App. 1996), the court found attornment necessary only because the tenancy terminated when the mortgagee foreclosed on a mortgage that antedated the lease.  The court of appeals concluded that the tenant's "rights under the lease could not have continued to exist unless [the landlord] had terminated its estate through a voluntary transfer to a successor." *Id.* at 272

In this case, the Whites did not cause the leasehold to terminate by voluntarily transferring the property to WFHI.  WFHI is not a stranger to whom Transwestern West Valley was required to attorn to create a landlord-tenant relationship.  Rather, WFHI is in privity with the original landlord, the Whites.  WFHI became Transwestern West Valley's landlord by operation of law when the Whites conveyed the property to it.  Consequently, there was no need to seek an attornment from Transwestern West Valley.  Under Utah law, the doctrine of attornment does not apply in this case.  WFHI is in privity of estate with Transwestern West Valley and may enforce the lease covenants that run with the property as a matter of law.

Furthermore, the parties waived any requirement for attornment under the terms of the Lease Agreement.  Section 24(j) of the Lease Agreement provides that it "shall apply to and bind the heirs, executors, administrators, successors, and assigns of all parties hereto."  Transwestern West Valley asserts that the Lease Agreement contains no attornment provision by which the lessee Transwestern West Valley agreed to attorn to a subsequent owner of the property.  Although there is no specific attornment provision, Section 24(j) is evidence that Plaintiff could deed the property to another entity without the need for attornment.  In *Westport Land*

7

*Properties, Inc. v. Latham*, 875 S.W.2d 630, 630 (Mo. App. 1994), the court found that a similar provision waived any need for attornment.

Moreover, the material facts establish that Transwestern West Valley recognized WFHI (under its previous name Harmony Investments) as its landlord.  In fact, Transwestern West Valley made over 70 payments to Harmony Investments over the time it occupied the premises, sent tax notices to Harmony Investments, and in all respects recognized Harmony Investments as its landlord.  These actions are at odds with Transwestern West Valley's position that it would deal only with the Whites as individuals and that it acted to terminate the agreement as soon as it learned of the White's transfer of the property to another entity.

The court concludes that there is no factual dispute and WFHI is entitled to summary judgment.  The issue regarding attornment presents only legal questions, and the underlying material facts that are relevant to attornment are not in dispute.  Therefore, the court concludes that WFHI is entitled to summary judgment.  WFHI became Transwestern West Valley's landlord when the Whites granted the property to it, and there was no need for attornment.  The Lease Agreement also states that it applies to all successors of the parties.  Accordingly, WFHI in entitled to judgment against Transwestern West Valley for the Lease Payments and other payments Transwestern West Valley is obligated to pay WFHI under the Lease Agreement.  Although WFHI sought judgment on several categories of costs it has incurred as a result of Transwestern West Valley's breach, Transwestern West Valley's opposition to WFHI's motion focused only on attornment and failed to oppose WFHI's arguments regarding amounts due pursuant to the terms of the Lease Agreement.

In addition to failing to make its monthly lease payments, at the time Transwestern West Valley surrendered the property, Transwestern West Valley did not pay WFHI any of the deposits it was holding or any of the rent payments it had collected from July to October 2004. Furthermore, pursuant to Section 6 of the Lease Agreement, Transwestern West Valley is required to pay maintenance, repair and restoration costs.  Since Transwestern West Valley abandoned the property in October of 2004, WFHI has spent $29,637.42 on repairs and maintenance, $39,195.95 on security, trash and snow removal, and landscaping, $60,000 to repair the roofs of the buildings, $21,523 to paint the exterior of the buildings, and $60,000 to repair landscaping.  Since October of 2004, WFHI has spent $210,356.37 on maintenance, repairs, and restoration.

Pursuant to Section 7 of the Lease Agreement, Transwestern West Valley is required to pay all taxes assessed on the property during the term of the Lease.  Since October of 2004, WFHI has paid $96,372.91 in taxes.  And, pursuant to Section 10 of the Lease Agreement, Transwestern West Valley is required to pay all charges for gas, electricity, water, sewer, and other utilities associated with the property.  Since October of 2004, WFHI has paid utilities in the amount of $12,280.90.

Also, pursuant to Section 20 of the Lease Agreement, Transwestern West Valley is required to pay attorneys fees resulting from any breach of the Lease Agreement.  WFHI has incurred and continues to incur attorneys' fees and costs as a result of Transwestern West Valley's refusal to make payments under the Lease Agreement.  WFHI shall provide the court, within twenty days of the date of this Order, detailed records and affidavits to support an award of attorneys fees resulting from Transwestern West Valley's breach of the Lease Agreement.

9

**Cross Motions on Alter Ego Claim**

Both parties have moved for summary judgment on WFHI's claim that the Transwestern entities are merely alter egos of Business Properties LLC.  Under Utah law, WFHI must prove two elements to succeed on an alter ego claim: (1) that there is such a unity of interest and ownership between the entities that the separate personalities of the different entities no longer exist; and (2) that observance of the corporate form would sanction a fraud, promote injustice; and cause an inequitable result to follow.  *Messick v. PHD Trucking Serv. Inc.*, 678 P.2d 791, 794 (Utah 1984).  The first element is known as the formalities requirement, while the second element is called the fairness requirement and is addressed to the "conscience of the court."  *Salt Lake City Corp. v. James Constructors, Inc.*, 761 P.2d 42, 47 (Utah Ct. App. 1988).

WFHI must satisfy both elements before the corporate veil can be pierced.  "Courts must balance piercing and insulating policies and will only reluctantly and cautiously pierce the corporate veil."  *Id.* at 46.  Moreover, "[c]ourts have been extraordinarily reluctant to lift the veil in contract cases . . . where the 'creditor has willingly transacted business' with the corporation."  *D'Elia v. Rice Development Inc.*, 147 P.3d 515, 522 (Utah Ct. App. 2006).  "A key feature of the alter ego theory is that it is an equitable doctrine requiring that each case be determined upon its peculiar facts."  *James Constructors,* 761 P.2d at 47.

Defendants filed a motion for summary judgment claiming that WFHI cannot establish the second element of its alter ego claim.  WFHI filed its cross-motion on both elements. Because WFHI must satisfy both elements to establish an alter ego claim, the court will analyze each element in turn.

### A.  Formalities Element

To satisfy the formalities element, WFHI must show that there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or few individuals." *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979).  "In the parent-subsidiary situation, the central focus of the formalities prong is "the degree of control that the parent exercises over the subsidiary and the extent to which the corporate formalities of the subsidiary are observed." *James Constructors*, 761 P.2d at 47.

In *James Constructors*, the court recognized that several factors are considered "relevant to deciding whether the parent exercises 'the necessary control' over its subsidiary." *Id.*  In *James Constructors*, the court found that only six factors were relevant.  But the court cited to *United States v. Advance Mach. Co.*, 547 F. Supp. 1085, 1093 (D. Minn. 1982), which provided a list of eleven factors relevant to determining whether the alter ego test had been met:

> (a) The parent corporation owns all or most of the capital stock of the subsidiary;
> (b) The parent and subsidiary corporations have common directors and officers;
> (c) The parent corporation finances the subsidiary;
> (d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;
> (e) The subsidiary has grossly inadequate capital;
> (f) The parent corporation pays the salaries and other expenses or losses of the subsidiary;
> (g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;
> (h)  In the papers of the parent corporation or in the statement of its officers, the subsidiary is described as a department or division of the parent

11

> corporation, or its business or financial
> responsibility is referred to as the parent
> corporation's own.
> (i)  The parent corporation uses the property of the
> subsidiary as its own;
> (j)  The directors or executives of the subsidiary do
> not act independently in the interest of the
> subsidiary but take their orders from the parent
> corporation in the latter's interest;
> (k)  The formal legal requirements of the subsidiary
> are not observed.

*Id.*  (citing *C M Corp. v. Oberer Development Co.*, 631 F.2d 536, 539 (7th Cir. 1980)).

WFHI asserts that the undisputed facts demonstrate that Business Properties' control over Transwestern West Valley satisfies all eleven factors as a matter of law.  Business Properties asserts that the inquiry is fact intensive and there are adequate questions of fact for the court to defer the issue to a jury.

First, it is undisputed that Transwestern West Valley's sole member is Business Properties.  In addition, Transwestern West Valley's managers were Business Properties' managers as well.  Since the other Transwestern entities participated in the management of Transwestern West Valley and/or Business Properties, it is worth noting that these entities were also managed by Rowe, Duncan and/or Quazzo.  Transwestern Investment, the asset manager of both of Business Properties and Transwestern West Valley, employed and compensated Rowe, Duncan, and Quazzo.  Although there may not be a perfect overlap of employees at all times, there is a significant overlap between the companies.

Furthermore, Transwestern West Valley was capitalized by Business Properties. Transwestern West Valley's initial capitalization consisted entirely of the leasehold.  There is no indication that Transwestern West Valley was financed by any other source other than Business

Properties and Business Properties' asset manager Transwestern Investment.  Whether this financing occurred directly from Business Properties or its agent, Tanswestern Investment, is irrelevant.  The Business Properties Operating Agreement calls for Business Properties to organize "project companies," through which Business Properties is to purchase and operate these investment properties.  It is undisputed that Business Properties, through its agent, Transwestern Investment, created Transwestern West Valley solely to be the project company for the leasehold.

The *James Constructors* court noted that "'shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities.  If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.'"  *James Constructors*, 761 P.2d at 47 n.10 (citation omitted).  Nonetheless, during the operation of the leasehold, Business Properties consistently left Transwestern West Valley without reasonably adequate capital for its prospective liabilities.

Business Properties did not infuse Transwestern West Valley with operating capital at its inception.  Rather, Transwestern West Valley's initial capitalization consisted primarily of the leasehold, which Business Properties valued at $308,432.  The value placed on the leasehold in 1997 appears to be speculative because the leasehold was written off in December 2002 after Business Properties determined that it had no value.  In other words, Business Properties did not initially fund Transwestern West Valley with cash, but instead capitalized it with an investment.

From 1998 to 2002, Business Properties withdrew all available cash from Transwestern West Valley.  An employee of Business Properties' agent Transwestern Investment would

determine if there was excess cash in Transwestern West Valley's account, and then would make a distribution to Business Properties.  The Transwestern Investment employee did not have a copy of the Lease Agreement.  As such, the distribution decisions were made without regard to requirements contained in the Lease Agreement or prospective liabilities in connection with the Lease Agreement.

Business Properties withdrawals left Transwestern West Valley with minimum positive equity capital by December 31, 2002.  On February 1, 2002, Transwestern West Valley's monthly rent payments under the Lease Agreement also increased from $13,500 to $16, 875. Beginning in 2002, Transwestern West Valley incurred operating losses, and Business Properties contributed cash and covered expenses until Transwestern West Valley stopped making leasehold payments and surrendered the property in 2004.

Transwestern West Valley was grossly undercapitalized in light of Section 22 of the Lease Agreement, which required Transwestern West Valley to "maintain a minimum net worth of at least One Hundred Thousand Dollars ($100,000)."  For example, even though $12.8 million in debt funding was required to purchase the Business Park, Transwestern West Valley's books do not reflect any of this debt.  Relative to the entire purchase price of the business park, Transwestern West Valley's proportionate share of this $12.8 million debt should have been $200,000, based on the value assigned to Transwestern West Valley's assets.  If this debt had been recorded, Transwestern West Valley would have fallen below the $100,000 net worth requirement immediately after it was assigned the Lease Agreement.  Even without the unrecorded debt, Business Properties' distributions left Transwestern West Valley unable to meet the $100,000 net worth requirement by no later than December 31, 2002.

14

In sum, Transwestern West Valley began operating without any cash, distributed all of the cash it earned to Business Properties, then incurred liabilities that further rendered it insolvent. This is gross undercapitalization as defined by the Utah courts and as provided by the express terms of the Lease Agreement that the lessee maintain a $100,000 net worth.

Another relevant factor in the alter ego analysis is whether the parent corporation pays the salaries and expenses of the subsidiary. Interestingly, Transwestern West Valley did not have any employees. Instead, Business Properties paid an annual management fee to Transwestern Investment equal to 1.5% of the aggregate capital commitments in monthly arrears, as contemplated by the Business Properties Operating Agreement. Consequently, Business Properties paid hundreds of thousands of dollars to Transwestern Investments for asset management services provided by Transwestern Investment to Business Properties and its subsidiaries, including Transwestern West Valley.

Business Properties also paid Transwestern West Valley's filing fees. And when Transwestern West Valley began operating at a loss due to previous distributions, Business Properties contributed enough cash to Transwestern West Valley so that it could cover its leasehold payments. Business Properties points to this fact as evidence that it acted properly. Legally, however, this is evidence that Transwestern West Valley is its alter ego.

It is undisputed that Transwestern West Valley's business was based entirely on the leasehold given to it by Business Properties. This was by Business Properties' design. Pursuant to the Transwestern West Valley Operating Agreement, Transwestern West Valley's sole purpose was to acquire, own, manage, finance, refinance, lease, maintain, improve, develop, dispose of and take all other actions necessary or desirable with respect to the leasehold property.

Additionally, every aspect of Transwestern West Valley's business was controlled by Business Properties through its agent Transwestern Investment.  For example, Transwestern Investment retained property managers and leasing brokers, negotiated and approved leases, made all other property-related decisions, and provided certain accounting services.  Transwestern Investment also entered into a Leasing Agreement on behalf of Transwestern West Valley with Business Properties Group for lease brokering services and reports regarding the leasing market.  Business Properties Group is an affiliate of Business Properties.

Transwestern Investment, as "agent" for Transwestern West Valley, ensured that Transwestern West Valley only hired Transwestern Affiliates.  For example, Transwestern West Valley retained Transwestern Commercial Services pursuant to a Property Management Agreement.  Transwestern Commercial Services is also an affiliate of Business Properties' member and manager, Transwestern Business Properties.  Over the years, Transwestern Commercial Services managed and operated the leasehold in exchange for a management fee of 3% of gross revenues collected, plus $10,000 per month.  Transwestern Commercial Services handled the day-to-day management of Transwestern West Valley, including collecting rent from the subtenants, reconciling bank statements, cutting checks, and compiling monthly reports.  Transwestern Commercial Services also maintained the books and records of Transwestern West Valley and Transwestern Metro Business Park.  In other words, Business Properties' agent, Transwestern Investment, and that agent's contractor, Transwestern Commercial Services, performed all of the work related to the operation of Transwestern West Valley's only business, the leasehold given to it by Business Properties.

Neither Transwestern West Valley nor Transwestern Metro generated any financial statements.  Instead, Business Properties generated consolidated financial statements, which "include[d] the accounts of its 100%-owned and managed limited liability companies," such as Transwestern West Valley.  As a consequence of this consolidation, Business Properties treated Transwestern West Valley's property as its own.  For example, its 2000 audited, consolidated financial statement mentioned that Business Properties was subject to the leasehold.

Similarly, neither Transwestern West Valley nor Transwestern Metro has ever filed a tax return.  For each year from 1997 to present, Business Properties filed a single tax return for itself and its subsidiaries.  Transwestern West Valley does not have its own tax identification number.  Accordingly, any bank accounts that were opened and all 1099-MISCs that were provided by Transwestern West Valley used Business Properties' tax identification number.

Business Properties never owned any property, but rather used its subsidiaries' property as its own.  Business Properties used Transwestern West Valley's cash as its own and withdrew it without regard for Transwestern West Valley's future obligations under the Lease Agreement.  Through its managers and agents,  Business Properties caused Transwestern West Valley to pledge its assets to benefit Transwestern Metro.  Even though Transwestern Metro was the only borrower under the Greenwich Capital Loan, Business Properties caused Transwestern West Valley and Transwestern Metro to refinance the obligation together and to become jointly and severally liable to Comerica Bank for a $13 million loan.  The assets of both companies were pledged as collateral.  Transwestern West Valley did not receive any portion of the $13 million and Business Properties admitted that there probably was not a whole lot of benefit to Transwestern West Valley.

Later, Business Properties reclassified any net worth in Transwestern West Valley as payable to Business Properties rather than an equity investment.  Finally, Business Properties' treatment of the leasehold and fee property as a single investment demonstrates that these investments were operated for its own benefit.  In its consolidated financial statements, Business Properties repeatedly grouped the leasehold and the fee property together as one unit called "Metro."  Similarly, in its general ledger, Business Properties combined Transwestern West Valley and Transwestern Metro investments into a single account called "Metro Business Park I."

Moreover, Transwestern West Valley did not have the appearance of an independent personality.  All major decisions were made by Business Properties' agents, and for the benefit of Business Properties.  Transwestern West Valley's Operating Agreement actually directed the managers to "operate the Company in accordance with the requirements of the BP Operating Agreement."  Transwestern was never intended to, and in practice never did, act independently. Business Properties' asset manager, Transwestern Investment, decided when to make distributions to Business Properties and did so without regard for Transwestern West Valley's future needs.  Additionally, Duncan, Rowe, and Quazzo, on behalf of Business Properties, Transwestern West Valley, and five other Transwestern entities, decided to cause Transwestern West Valley to be jointly and severally liable for the Comerica loan and to pledge all its assets. This allowed Transwestern Metro to refinance a prior obligation for which Transwestern West Valley had no liability.   If Transwestern West Valley was in fact an independent entity, there would be no rational basis for this decision.

18

Business Properties then decided to sell both the fee property and the leasehold.  When Business Properties could not find a buyer that was interested in assuming the leasehold, it sold the fee property alone for $16.1 million.  As Transwestern West Valley and its leasehold were no longer needed, Transwestern West Valley defaulted on the Lease Agreement and surrendered the leasehold shortly thereafter.  Transwestern Investment, in consultation with managers for Business Properties member, Harvard Endowment, made the decision to stop making payments and to surrender the leasehold.

Transwestern West Valley also overlooked the maintenance of its registration with the State of Utah.  Although the leasehold was purchased and assigned to Transwestern West Valley in December 1997, Transwestern West Valley did not register with the State of Utah until May of 1998.  Also between the time it stopped making Lease Agreement payments and surrendered the leasehold, Transwestern West Valley allowed its registration with the State of Utah to expire. While it later re-registered, these mistakes leave the impression that Transwestern West Valley's managers were unconcerned with formalities.

Additionally, since being formed in 1997, Transwestern West Valley's managers failed to hold any meetings, at least not as the managers of Transwestern West Valley.  When asked to produce all of its meeting minuets, resolutions, annual reports, and corporate filings, Transwestern West Valley produced only the December 5, 1997, and December 10, 2001, unanimous consent agreements.  Transwestern West Valley did not document any decision to make distributions, to execute lease agreements with subtenants, to stop making lease payments, or to surrender the leasehold.  These decisions were actually all made by Business Properties and its agents.  Transwestern West Valley's failure to comply with its basic record keeping

obligations demonstrates a failure to follow corporate formalities.

In addition to these eleven factors, other factors specific to this case also demonstrate the "unity of interest and ownership" between Business Properties and Transwestern West Valley. While Transwestern Commercial Services operated both the fee property and the leasehold, it repeatedly confused Transwestern West Valley with Transwestern Metro.  In fact, Transwestern Commercial Services treated Transwestern Metro as the owner of both the fee property and the leasehold, thereby ignoring Transwestern West Valley's existence for subleasing purposes.  At least half a dozen subleases of premises that were part of the leasehold were executed by Transwestern Metro as the landlord.  Transwestern Commercial Services also prepared dozens of lease summaries that identified entities other than Transwestern West Valley as the owner of space that is part of Transwestern West Valley's leasehold.  Consequently, Transwestern West Valley's subtenants made dozens of payments to Transwestern Metro.  Likewise, Transwestern Metro executed service contracts that covered the entire business park and should have been executed by Transwestern West Valley as well.

Despite these mistakes, Transwestern West Valley received the subtenants' rent money as Transwestern Commercial Services deposited the rent payments into the correct account. Transwestern Commercial Services also caused Transwestern West Valley to pay a share of services for which Transwestern Metro had contracted.  If not for the unity of interest and ownership between the entities, Transwestern West Valley would not have received rental income or services for the leasehold premises.

Defendants' response to these facts take issue only with immaterial facts, none of which are sufficient to create an issue of material fact that would preclude summary judgment.

Defendants also rely heavily on public policy arguments.  Defendant asserts that the law affords liability protection through the use of corporations and limited liability companies, and this protection provides incentive to persons and companies to do business and invest in the economy.

While Defendants rely heavily on its assertions that public policy favors the protection of corporations, such public policy does not trump all other public concerns.  Corporations cannot escape contractual liabilities merely because they are set up as limited liability corporations.  Moreover, the foregoing factors outlined by courts ensure that the competing public policies are considered.  Based on an analysis of these relevant factors as well as facts peculiar to this case, the court finds overwhelming evidence in favor of Plaintiff's claim that Business Properties disregarded the formalities requirement with respect to Transwestern West Valley.  No reasonable jury could conclude otherwise.  The court, therefore, concludes that Plaintiff has established the first element of its alter ego claim as a matter of law.

## B.  Fairness Element

WFHI argues that the observance of Transwestern West Valley as an independent limited liability company would sanction a fraud, promote injustice, or an inequitable result would follow.  The fairness element is "addressed to the conscience of the court, and the circumstances under which it will be met will vary with each case."  *Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 794 (Utah 1984).  Yet, "that does not mean that a court has carte blanche to refuse to recognize the legal separation of shareholder and corporation."  *Transamerica Cash Reserve, Inc. v. Dixie Power and Water, Inc.*, 789 P.2d 24, 26 (Utah 1990).  The fairness prong is "not met simply because a trial court finds that [the corporate form] would in some way prevent a creditor

of a controlling shareholder from quickly being made whole." *Id.* Nor is the fairness prong met "just because the existence of the corporate form is inconvenient for a creditor seeking to pursue the shareholder's assets." *Id.*

Defendants argue that WFHI's allegations that it did not receive lease payments are not enough under applicable case law. WFHI must come forward with something more than its claim for receipt of payment to satisfy the fairness prong. WFHI must show (i) that observance of the corporate form would sanction a fraud or promote injustice, and (ii) "that the corporation itself played a role in the inequitable conduct at issue." *Id.*

While Defendants contend that WFHI's inability to collect on a judgment is not an injustice under the alter ego test, Defendants position is based on an incomplete and inaccurate reading of the *Transamerica Cash Reserve* case. The law is actually that WFHI's inability to collect a judgment is not injustice unless it stems from Business Properties' actions. The court recognized that "[t]o find that observance of the corporate form would sanction a fraud and promote injustice or an inequitable result would follow, it must be shown that the corporation itself played a role in the inequitable conduct at issue." *Id.* In other words, "the 'injustice' or 'inequity' to the claimant must be connected with the lack of separateness between the corporation and its controlling stockholder and the failure to observe corporate formalities." *Cascade Energy and Metals Corp. v. Banks*, 896 F.2d 1557, 1578 (10th Cir. 1990).

The *James Constructor* court recognized that "'the adequacy of [a] corporation's capitalization looms large in [a] court's evaluation of the unfairness prong. . . . . [S]hareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be

done and the risks of loss, this is a ground for denying the separate entity privilege.'" *James Constructors*, 761 P.2d at 47 n.10 (citation omitted).   Moreover, WFHI need not show actual fraud, only that a failure to pierce the corporate veil would result in an injustice. *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987).  In *East Market Street Square Inc v. Tycorp Pizza IV, Inc.*, 625 S.E.2d 191 (N.C. App. 2006), the court found that the breach of a lease agreement satisfied the second prong of the alter ego test because performance of a contract is a positive legal duty.

The court agrees with Defendants that when a corporation is unable to make another whole, a plaintiff typically cannot look to a parent corporation for a remedy.  But WFHI is not claiming that it has met the fairness prong simply because Transwestern West Valley does not have the resources to make it whole.  Rather, WFHI satisfies the fairness prong because it has demonstrated that Business Properties not only "played a role" in Transwestern West Valley's breach of the Lease Agreement, it was the primary cause of the breach and the party responsible for Transwestern West Valley's inability to make WFHI whole.

As discussed above, Business Properties created Transwestern West Valley and micromanaged its day-to-day business.  When it could no longer operate Transwestern West Valley at a profit, it caused it to breach the Lease Agreement and abandon the premises.   It was Business Properties and its agents who made the decision that Transwestern West Valley would cease making its Lease Payments and then surrender the property.  It was also Business Properties who received Transwestern West Valley's cash reserves and kept it undercapitalized.

Defendants assert that the Whites received exactly what they bargained for when they signed the Lease Agreement.  Defendants argue that the WFHI does not and cannot allege that it

was duped into allowing Transwestern West Valley to assume the lease obligation.  In fact, the Whites had no right to object to the assignment of the lease to whatever entity or person.  Section 21 of the Lease Agreement states that the lessee can assign its interest, in whole or in part, without the prior written approval of the lessor.

But WFHI's inability to object to an assignment under the Lease Agreement is irrelevant to the alter ego issue.  Defendants' argument in this regard is based on the faulty assumption that WFHI would have had to have objected to the assignment to Transwestern West Valley in order to state an alter ego claim.  The two are not related.  A lessor's inability to object to an assignment does not mean that the assignee is free to breach the contract without consequence.

WFHI is not required to show that the assignment of the Lease Agreement caused the inequity.  Instead, WFHI has demonstrated that the alter ego relationship between Transwestern West Valley and Business Properties is the cause of the inequity.  The alter ego doctrine is an equitable doctrine that exits for the purpose of providing remedies to plaintiffs who are damaged by their dealings with an alter ego of a controlling entity.  The doctrine would have no meaning if WFHI was prevented from recovering from Business Properties in this situation.  That is, the observance of Transwestern West Valley's limited liability form would sanction an injustice or inequitable result.

Moreover, although Defendants contend that the Whites received exactly what they bargained for when they signed the Lease Agreement, the Whites did not receive what they bargained for because Transwestern West Valley, Business Properties' alter ego, abandoned the leasehold when it became unprofitable and unnecessary to the pursuit of Business Properties' interests.  The Whites bargained for a Lease Agreement with a term that extended to 2012.  The

24

fact that the Whites could not object to the assignment of the Lease Agreement, does not mean that the lessee could shorten the term of the Lease Agreement.

The court concludes that there is clearly a relationship between the unity of interests and the inequity caused by it. Therefore, WFHI has established the fairness element of its alter ego claim. Accordingly, the court grants WFHI's cross-motion for summary judgment against Business Properties on its alter ego claim and denies Business Properties motion for summary judgment on this element.

While most of Defendants' memorandum relates only to Business Properties, Transwestern Metro is not entitled to summary judgment on the fairness prong of the alter ego claim because it also played a role in the injustice to WFHI. Transwestern Metro did not provide any analysis for why it should be entitled to summary judgment. However, WFHI has demonstrated that there was a unity of interest between Business Properties, Transwestern Metro, and Transwestern West Valley that benefited both Business Properties and Transwestern Metro. It was the sale of the fee property held by Transwestern Metro and its receipt of money that contributed to the determination that Transwestern would breach the Lease Agreement and abandon the leasehold interest. Therefore, the court concludes that there are questions of fact as to Transwestern Metro's motion for summary judgment on the alter ego claim and it is, therefore, denied.

## CONCLUSION

Based on the above reasoning, Plaintiff's Motion for Partial Summary Judgment against Transwestern West Valley on WFHI's breach of contract claim is GRANTED. Defendants Business Properties LLC and Transwestern Metro Business Park LLC's Motion for Summary

Judgment on Plaintiff's Alter Ego Cause of Action is DENIED, and Plaintiff's Cross-Motion for

Summary Judgment on Alter Ego Claim is GRANTED.

DATED this 27th day of September, 2007.

BY THE COURT

DALE A. KIMBALL
United States District Judge